James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

CHAIN SERVICE RESTAURANT, LUNCHEONETTE & SODA FOUNTAIN EMPLOYEES UNION, LOCAL 11, HOTEL & RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION, AFL–CIO, Defendant.

No. 69 Civ. 4675.

United States District Court, S. D. New York.

March 6, 1973.

Whitney North Seymour, Jr., U. S. Atty., New York City, by T. Gorman Reilly, Asst. U. S. Atty., Dept. of Labor, by Ian P. Spier, New York City, for plaintiff.

Luxemburg & Yudenfriend, by Harold L. Luxemburg, New York City, and Marc J. Luxemburg, New York City, of counsel, for defendant.

EDELSTEIN, Chief Judge.

## OPINION

In March 1969 an election of officers was held by the Chain Service Restaurant, Luncheonette and Soda Fountain Employees Union, Local 11, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO (hereinafter referred to as Local 11). Shortly thereafter, a union member, alleging that union activity during the course of the election violated Title IV of the Landrum-Griffin Act, § 401 et seq. (Labor-Management Reporting and Disclosure Act, ("LMRDA") 29 U.S.C. § 481 et seq. (1970)) protested the outcome of the election to union officials. Following the union's refusal to remedy the situation, the member filed a complaint with the Secretary of Labor, who properly initiated judicial proceedings. Ultimately, an out-of-court agreement was reached between the parties setting aside the contested election. In accordance with this agreement an order was entered by this court on November 15, 1971, directing the union to conduct a second election under the supervision of the Secretary of Labor and in accordance with the provisions of § 401 et seq. of Landrum-Griffin, and ordering the Secretary of Labor to "certify to the Court the names of the officers elected," at which time the court was to enter a decree "declaring such persons to be officers of the union." (Order filed November 15, 1971.) The election was held on April 25, 1972. Pursuant to this court's mandate, the Secretary of Labor submitted a Certification of Election dated August 15, 1972, and moved for an order declaring those persons certified to be the elected officers of Local 11. All of those candidates who received a majority of the votes cast for the office in issue were certified, with the exception of Elmer Hauck, a candidate for president. The union opposed the Secretary's motion, demanding that all candidates, including Hauck, be declared officers of Local 11.

The refusal to certify Hauck was based upon the Secretary's assertion that the provisions of § 504 of the Landrum-Griffin Act (29 U.S.C. § 504) rendered Hauck ineligible to hold union office. Section 504(a) prohibits any person who has been convicted of bribery from holding union office for a period of five years from the date of final dis-

position of the matter.[1] According to the Secretary, Hauck's conviction[2] of conspiring to violate and of violating § 302(a)(1), (a)(4) and (b)(1) of the Taft-Hartley Act (Labor Management Relations Act, ("LMRA") 29 U.S.C. § 186(a)(1), (a)(4) and (b)(1) (1970))[3] brought Hauck within the § 504 proscriptions. The union maintains, however, that (1) notwithstanding Hauck's conviction under § 302 of the Taft-Hartley Act, Hauck was not convicted of bribery; and (2) the Secretary of Labor did not have standing to refuse to certify Hauck.

The first question before this court is whether Hauck's conviction for violating § 302(a)(1), (a)(4) and (b)(1) of Taft-Hartley by requesting, demanding, receiving and accepting payments from employers of employees whom Hauck represented constitutes bribery within § 504 of Landrum-Griffin. The union contends that since the term "bribery" was not used in the indictment, conviction or sentence, Hauck is not precluded by § 504(a) of the Landrum-Griffin Act from holding union office. Because such an interpretation of § 504(a) would necessarily frustrate the Congressional policies underlying the Act, it cannot be accepted by this court.[4] To hold otherwise would violate the Supreme Court's mandate that a statute

1. Section 504 states, in pertinent part:

(a) No person . . . who has been convicted of, or served any part of a prison term resulting from his conviction of, robbery, bribery, extortion, embezzlement, grand larceny, burglary . . . shall serve—

(1) as an officer, director, trustee, member of any executive board or similar governing body . . . of any labor organization . . . for five years after such conviction or after the end of such imprisonment. . . .

. . . . .

(c) For the purposes of this section, any person shall be deemed to have been "convicted" and under the disability of "conviction" from the date of the judgment of the trial court or the date of the final sustaining of such judgment on appeal, whichever is the later event, regardless of whether such conviction occurred before or after [the date of enactment of this Act].

Landrum-Griffin Act § 504, LMRDA, 29 U.S.C. § 504 (1970).

2. On October 12, 1971, Hauck was convicted, fined and sentenced by Judge Milton Pollack. The conviction was affirmed by the Court of Appeals for the Second Circuit on April 7, 1972. United States v. Ferrara, 458 F.2d 868 (2d Cir. 1972). Hauck then petitioned for certiorari to the United States Supreme Court. On June 26, 1972, the Supreme Court denied certiorari and Hauck's conviction became final. 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972).

3. The pertinent parts of § 302 are as follows:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

. . . . .

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

Taft-Hartley Act, § 302, LMRA, 29 U.S.C. § 186(a)(1), (a)(4) and (b)(1) (1970).

4. A similar argument was made in Lippi v. Thomas, 298 F.Supp. 242 (M.D.Pa.1969) and was rejected by the court. In *Lippi*, plaintiff was convicted of "aiding and abetting in the willful misapplication of bank funds pursuant to 18 U.S.C. § 656." *Id.* at 246. Plaintiff argued "that since he was not convicted of embezzlement, Section 504(a) of LMRDA [was] inapplicable to prevent him from being nominated for President of District I, UMWA." *Id.* The court rejected this narrow construction of § 504(a), holding that "[s]uch a strained result could not have been within the contemplation of Congress when it approved Section 504(a), especially in view of the broad findings made at the time of passage." *Id.* at 248.

must be construed "in the light of the mischief to be corrected and the end to be attained." [5] Therefore, we must consider those factors which lead to the enactment of § 504.

Congress' primary purpose for adopting the Landrum-Griffin Act, as evidenced by the legislative history, was to eliminate the intolerable and corrupt conditions which prevailed throughout segments of organized labor during the 1950's.[6] Congressional investigations established that some unions, having fallen under the dictatorial control of criminals and racketeers, were no longer responsive to the demands of their memberships.[7] To curb the abuses which gave rise to these conditions and to promote internal union democracy, Congress directed unions to conduct elections in accordance with procedures which are fundamental to a democratic electoral process (Title IV). Realizing, however, that a democratic election would not, in itself, eliminate dishonest officials, the legislators provided safeguards which they believed would prevent irresponsible and unscrupulous persons from gaining control of union government (Title V). To this extent the protagonists in Congress, throughout the entire legislative history, accepted language preventing persons convicted of certain crimes from holding office.[8]

5. Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934). The Court reiterated its position stated in United States v. American Trucking Ass'n, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). In the latter case the court stated:

In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.

Id. at 542, 60 S.Ct. at 1063. (citation omitted)

6. S.Rep. No. 187 on S. 1555 as reported, 86th Cong., 1st Sess., 2–4, 12–16 (1959) as contained in 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 398–400, 408–412 (1959) [hereinafter cited as 1 Legislative History] ; H.Rep. No. 741 on H.R. 8342 as reported, 86th Cong., 1st Sess., 1–7, 9–13 (1959) as contained in 1 Legislative History, 759–765, 767–771, U.S. Code Cong. & Admin.News, p. 2318. See also 105 Cong.Rec. 5983 (1959) (remarks by Sen. Kennedy) ; 105 Cong.Rec. 6131 (1959) (remarks by Sen. Ervin) as contained in 2 Legislative History 1032–1034; 105 Cong.Rec. 7021–22 (1959) (remarks by Sen. Kennedy), as contained in 2 Legislative History 1258–1259 ; 105 Cong.Rec. 13860 (1959) (remarks by Sen. Williams) as contained in 2 Legislative History 1313 ; Wirtz v. Hotel, Motel & Club Employees Union, Local 6, 391 U.S. 492, 496–499, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1967) ; Wirtz v. IUOE Locals 410, 410A, 410B & 410C, 366 F.2d 438, 442 (2d Cir. 1966).

7. Id.

8. Each proposed labor-management reform bill introduced into the House of Representatives and the Senate prior to the enactment of the Landrum-Griffin Act included language prohibiting persons convicted of bribery and other crimes from holding union office. See S. 505, 86th Cong., 1st Sess., § 305 (Jan. 20, 1959) (the original Kennedy-Ervin Bill) ; S. 748, 86th Cong., 1st Sess., § 303 (Jan. 28, 1959) (the Administration Bill) ; S. 1002, 86th Cong., 1st Sess., § 1(2) (Feb. 6, 1959) (introduced by Sen. Mundt) ; H.R. 4473 as referred, 86th Cong., 1st Sess., 102(c)(4) (Feb. 16, 1959) (introduced by Rep. Barden) ; S. 1137 as referred, 86th Cong., 1st Sess., § 410 (Feb. 19, 1959) (introduced by Sen. McClellan) ; S. 1555 as reported, 86th Cong., 1st Sess., § 305 (April 14, 1959) (the Kennedy-Ervin Bill) ; S. 1555 as passed Senate, 86th Cong., 1st Sess., § 405 (April 25, 1959) (S. 1555 was passed by the Senate by a vote of 90 to 1) ; H.R. 7265 as referred, 86th Cong., 1st Sess., § 308 (May 20, 1959) (the Kearns Bill) ; H.R. 8400 as referred, 86th Cong., 1st Sess., § 504 (July 24, 1959) (the Landrum-Griffin Bill) ; H.R. 8342 as reported, 86th Cong., 1st Sess., § 504 (July 30, 1959) (the House Committee Bill) (H.R. 8342 was ultimately passed by the House on August 14, 1959, by a vote of 303 to 125). Moreover, the Legislative History, as reflected by the Congressional Record, indicates minimal opposition to this provision. Thus, for example, there was opposition to a provision barring from holding union office for life persons convicted of certain crimes. Instead, a five-year prohibition period was favored. See, e. g., Sen. Morse's statement quoting Arthur Goldberg, 105 Cong.Rec. 7425–7428 (1959), as contained in 2 Legislative History 1265–1269. Furthermore, Rep. Dent,

That this was Congress' intent is evidenced by the following statement which was included by the drafters in the preamble.

(b) The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives.

(c) The Congress, therefore, further finds and declares that the enactment of this Act is necessary to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended.

Landrum-Griffin Act § 401(a), 29 U.S.C. § 401(a) (1970).

■ Unfortunately, Congress failed to provide, in either the Taft-Hartley Act or the Landrum-Griffin Act, definitions for the various crimes enumerated in § 504(a), leaving the definitional task to the judiciary. Recognizing that a narrow reading of § 504(a) would seriously impair the efficacy of the Act, the courts have uniformly held § 504(a) to be a remedial statute which should be liberally construed. When confronted with issues requiring the interpretation of the language, the courts have refused to put form ahead of substance. Instead, they have attempted to determine whether the specific offense involved came within the generally accepted definition of the related § 504(a) crime. Thus, the term "extortion," as used within the statute, has been held to encompass both state and federal extortion laws, Postma v. Teamsters Local 294, 229 F.Supp. 655 (N.D.N.Y.) aff'd per curiam 337 F.2d 609 (2d Cir. 1964); the term "grand larceny" has been defined to include a conviction for the crime of "conspiracy to cheat and defraud a union of its money, goods and property", Berman v. Teamsters Local 107, 237 F. Supp. 767, 768 (E.D.Pa.1964); and a conviction for "aiding and abetting in the willful misapplication of bank funds pursuant to 18 U.S.C. § 656" has been held to constitute embezzlement under § 504, Lippi v. Thomas, 298 F.Supp. 242, 244 (M.D.Pa.1969).

Although neither the Landrum-Griffin Act nor the Taft-Hartley Act contains a precise definition of "bribery," the legislative history of § 302 of Taft-Hartley, as amended by and incorporated into the Landrum-Griffin Act (§ 505), clearly expresses Congress' view that § 302 was an antibribery statute. For example, Senate Report No. 187 on S. 1555 as reported,[9] stated:

Section 111 of the committee bill strengthens section 302 of the Labor-

---

after stating his opposition to certain aspects of the proposed legislation, indicated his approval to the section which barred persons convicted of certain crimes from holding office. 105 Cong.Rec. 14643 (1959), as contained in 2 Legislative History 1529–1530. *See also* the discussion among Sens. Kennedy, McClellan and Mundt relating to § 305 of S. 1555 (the precursor of § 504), 105 Cong.Rec. 6554–6555 (1959), as contained in 2 Legislative History 1159–1160.

9. Prior to the enactment of the Landrum-Griffin Act, a series of bills containing proposed amendments to § 302 of the Taft-Hartley Act were introduced into the House of Representatives and the Senate. *See* n. 8 for a list of these bills. Section 111 of S. 1555 as reported to and as passed by the Senate contains language identical to the language ultimately adopted by Congress amending § 302 of Taft-Hartley. The reports of both houses of Congress clearly express the legislative intent underlying the enactment of the amendment. This statement by Congress should therefore be accorded great weight by the courts in interpreting § 302 as amended.

Management Relations Act [Taft-Hartley Act] by making it applicable to *all forms of extortion and bribery* in labor-management relations some of which may slip through the present law.

. . . . . .

Although [the] provisions of existing law would punish most forms of bribery or extortion if they were vigorously enforced by prosecuting officers, the testimony before the McClellan committee revealed loopholes [in the existing law]. The committee bill proposes to close the loopholes. U.S.Code Cong. & Admin.News p. 2329.[10]

The section of the House of Representatives bill which amended § 302 of Taft-Hartley (§ 505 of H.R. 8342 as reported and as ultimately adopted by the House), was identical to the Senate provision. The report accompanying the House bill contained an explanation of § 505 which was similar to the Senate's explanation.[11] It is thus apparent that

§ 302, as amended, of Taft-Hartley (§ 505 of Landrum-Griffin) was designed to "prevent corruption in the collective bargaining process through bribery of employee representatives by employers." [12]

Therefore, because both § 504(a) of Landrum-Griffin and § 302 of Taft-Hartley (§ 505 of Landrum-Griffin), seek the elimination of bribery in the context of labor-management relations, they must be read in conjunction with each other: § 302 makes the bribing of a union official a federal offense; § 504(a) forbids persons convicted of bribery from holding union office for a specified period. To hold otherwise, by accepting the union's argument that a conviction for violating § 302 is not tantamount to a conviction for bribery, would create the anomalous situation of prohibiting all persons convicted of bribery, *except union officials acting in their representative capacity*, from holding union office. Obviously such a result was not contemplated by Congress;[13] indeed,

---

10. S.Rep. No. 187 on S. 1555 as reported, 86th Cong., 1st Sess., at 13 (1959) as contained in 1 Legislative History 409. (emphasis added.)

11. H.R.Rep. No. 741 on H.R. 8342 as reported, 86th Cong., 1st Sess. (1959), as contained in 1 Legislative History 759. The Committee report contained the following statement:

The purpose of these amendments to *section 302 is to forbid any payment*, loan or *bribe* by an employer, employer association, or anyone acting on an employer's behalf, i. e., labor relations consultant. The demand or acceptance of such payment, loan, or bribe is also proscribed.

H.R.Rep. No. 741 on H.R. 8342 as reported, 86th Cong., 1st Sess. at 46 (1959), as contained in 1 Legislative History, 804 (emphasis added).

12. Schwartz v. Assoc. of Musicians, 340 F. 2d 228, 233 (2d Cir. 1964). For examples of courts declaring § 302 to be an anti-bribery statute, *see* Arroyo v. United States, 359 U.S. 419, 425–426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497, 501, 505 (1970); Blassie v. Kroger Co., 345 F.2d 58, 67 (8th Cir. 1965);

United States v. Annunziato, 293 F.2d 373, 379 (2d Cir.), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); United States v. Ryan, 225 F.2d 417, 426 (2d Cir. 1955) (L. Hand, J., dissenting, stated that § 302 "certainly does cover bribery"), rev'd. 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956), aff'd. on remand 232 F.2d 481 (2d Cir. 1956); Weir v. Chicago Plastering Institute, Inc., 177 F.Supp. 688, 692 (N.D.Ill.1959); United States v. Brennan, 134 F.Supp. 42, 47, 48–49 (D.Minn.1955).

*See generally*, Note, Taft-Hartley Regulation of Employer Payments to Union Representatives: Bribery, Extortion and Welfare Funds Under Section 302, 67 Yale L.J. 732 (1958).

13. Union officials who have used their positions to commit illegal acts have been barred from holding union office under § 504(a). Thus, in Postma v. Teamsters Local 294, 229 F.Supp. 655 (N.D.N.Y.), aff'd. per curiam, 337 F.2d 609 (2d Cir. 1964), a union executive, having been convicted of conspiring to use his position to extort money from certain members of the trucking industry, was banned from holding union office. The same proscription was invoked against a union official

Congress' precise objectives were to remove from office union officials convicted of accepting a bribe while engaged in union related activities. Furthermore, because the statutes were intended to reach "all forms of . . . bribery," it makes little difference whether the conviction was for a misdemeanor or a felony; or whether the defendant received a long or short sentence or no sentence at all, United States v. Priore, 236 F.Supp. 542, 544 (E.D.N.Y.1964), as contended by the union in oral argument. (Hearing of October 12, 1972, at pp. 16–17.)

In view of the broad purposes Congress sought to accomplish, and in view of the liberal construction accorded § 504(a), I am of the opinion that the requesting, demanding, receiving and accepting payments by union representatives from employers of employees whom they represent with an intent to influence the decisions of the representatives in violation of § 302 constitutes "bribery" within the meaning of § 504(a).

Moreover, even assuming that Hauck's conviction under § 302 was not *per se* a disabling factor under § 504(a), Hauck's crime constitutes bribery both within the general understanding of the term and within the Second Circuit's definition. Black's Law Dictionary defines bribery as "the offering, giving, receiving or soliciting of anything of value to influence action as an official or in discharge of a legal or public duty." Black's Law Dictionary 239 (4th ed. 1951). The Second Circuit has described bribery as "an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty." United

States v. Esperdy, 285 F.2d 341, 342 (2d Cir. 1961). *See also* United States v. Jacobs, 431 F.2d 754 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971), rehearing denied, 403 U.S. 912, 91 S.Ct. 2210, 29 L. Ed.2d 690 (1971); Razete v. United States, 199 F.2d 44 (6th Cir. 1952). In Hauck's case, he and his co-conspirators, all officers of Local 11, were convicted of accepting yearly payments from Walgreen Company, an employer of members of Local 11. In return, the officers agreed not to demand certain employee benefits which had been incorporated in prior collective bargaining agreements.[14] Clearly, Hauck's conduct comes within the meaning of bribery. As the Second Circuit indicated in affirming Hauck's conviction, there "was ample evidence to show" that appellants requested and received money "with the intent of being influenced as union officials." [15] United States v. Ferrara, 458 F.2d 868, 873 (2d Cir.) cert. denied 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972) (citation omitted). In light of such clear findings of fact, it would be ludicrous to state that Hauck had not participated in the bribery. Therefore, having been found guilty of accepting a bribe, Hauck is presently ineligible to hold union office.

The second issue before this court concerns the authority of the Secretary of Labor and the courts to approve the outcome of a supervised union election. Two related arguments have been stated by the union. First, the union contends that the Secretary of Labor was, in effect, attempting to enjoin Hauck from holding office; and that the Secretary lacked standing to seek such re-

who had been convicted for the crime of "conspiracy to cheat and defraud a union of its money. . . ." Berman v. Teamsters Local 107, 237 F.Supp. 767, 768 (E.D.Pa.1964).

14. The precise nature of Hauck's offense has been adequately described in the Second Circuit's affirmance of Hauck's conviction and the details need not be reiterated in their entirety. United States v. Ferrara, 458 F.2d 868, 869–871 (2d

Cir.), cert. denied 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972).

15. Hauck's conduct prompted the Second Circuit to remark:

These appeals graphically depict how corrupt labor union officials can use their positions to promote their own selfish interests at the expense of the interests of those they ostensibly represent.

*Id.* at 869.

lief. In support of this proposition the union relies on United States v. Jalas, 409 F.2d 358 (7th Cir. 1969). In *Jalas,* defendant Clarence Jalas had pleaded guilty on January 5, 1968, to violating § 302(b)(1) of the Taft-Hartley Act. Thereafter, on February 1, 1968, he was re-elected to union office. The government, proceeding on the theory that Jalas' continued service as a union official violated § 504(a) of Landrum-Griffin, sought to enjoin him from holding union office. The Court of Appeals for the Seventh Circuit denied the relief requested, holding that the government had no standing to bring an injunctive action to prevent a violation of § 504(a).

■ The union's reliance on *Jalas* is misplaced. There, the Secretary attempted to *remove, sua sponte,* an elected official from office. In the case at bar, the Secretary merely refused to *approve* an ineligible, elected candidate. For *Jalas* to be controlling, the court would have to equate the refusal to certify with an attempt to enjoin. This the court cannot do because the procedural distinction is extremely important: the Secretary may, as a matter of law, refuse to certify a candidate;[16] however, the propriety of the Secretary's attempt to obtain injunctive relief in these circumstances is questionable, especially in light of the Seventh Circuit's decision.[17]

■ The union also contends that the Secretary did not have the authority to refuse to certify an ineligible, elected candidate. The problem has been created by Congress' failure to delineate, by either statute or legislative history, the scope of the Secretary's, or the courts' power to approve the outcome of a supervised election. The union maintains that the Secretary's power to certify an election is governed by that portion of Title IV of the Landrum-Griffin Act which governs the post-election removal of installed officers. Section 402[18] permits the Secretary to institute a suit to

16. Landrum-Griffin Act § 402(c), 29 U.S.C. § 482(c) (1970). *See,* Hodgson v. Local 2212 Carpenters Resilient Flooring Union, 457 F.2d 1364 (3rd Cir. 1972) ; Beaird, Union Officer Election Provisions of the Labor-Management Reporting and Disclosure Act of 1959, 51 Va.L.Rev. 1306, 1329–1330 (1965).

17. The Second Circuit has held, however, that the Secretary of Labor, absent a complaint by a union member, can obtain an order enjoining a union from holding an election or from giving effect to one already in process if certain conditions exist. Wirtz v. IOUE Locals 545, 545–A, 545–B & 545–C, 366 F.2d 435 (2d Cir. 1966).

18. The pertinent parts of § 402 state:
(a) A member of a labor organization—
(1) who has exhausted the remedies available under the constitution and by-laws of such organization and of any parent body, or
(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation, may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.
(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this subchapter and such rules and regulations as the. Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.
Landrum-Griffin Act, § 402, 29 U.S.C. § 482 (1970).

remove a union official from office only upon a complaint of a union member who has unsuccessfully sought redress of his grievances through the internal union administrative process. Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). Under this theory, because union members failed to file a complaint with the Secretary after the April 25, 1972, election, the Secretary could not refuse to certify an ineligible, elected candidate.

The union's argument is not persuasive. An examination of the legislative history of § 402 indicates that the procedural rules governing the removal of union officials were included in § 402 to prevent, so far as possible, external interference with internal union affairs.[19] These rules were specifically enacted to prohibit the Secretary from intervening in union affairs on his own initiative. It makes little sense, however, to extend this policy to include circumstances in which the Secretary, pursuant to § 402, has already become involved in the union's internal affairs. Moreover, for the union to prevail, the court would have to define the refusal to certify as an attempt to remove. As already noted, the Secretary is not attempting to *remove* an official from office. Indeed, Hauck cannot be considered a union official, subject to removal, until the appropriate court order has been issued. Thus, the procedural provisions of § 402 which relate to removal do not preclude the Secretary from refusing to certify an ineligible candidate. In fact, the language of § 402(c) which relates to the validation of a supervised election indicates that the Secretary has not only the authority, but also the duty, to refuse to certify an ineligible candidate.

Pursuant to both § 402(c) and, in this case, a court order, the Secretary, having supervised the conduct of a union election, is to "certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization." Landrum-Griffin Act, § 402(c), 29 U.S.C. § 482(c) (1970). This provision suggests two different interpretations, both of which support the Secretary's action. A literal reading of the statute would impose upon the court a nonjudicial mandatory duty to accept, without question, the representations of the Secretary. The Secretary's certification would thus represent an order which is, for all purposes, final; and the ultimate approval of the court would be an empty formality. Assuming that such a construction is correct, Local 11 would be unable to challenge the Secretary's certification; and only those officers who were certified by the Secretary could be declared officers of Local 11. This interpretation, however, is not within the ambit of the statute. There is no suggestion that Congress intended the courts to "rubber-stamp" the Secretary's findings. Indeed, § 402 indicates that the opposite conclusions must be reached. By reading § 402(c) in conjunction with § 402(d),[20] it is clear that orders which designate elected officers are appealable. *Cf.* Schonfeld v. Wirtz, 258 F.Supp. 705 (S.D.N.Y.1966).

Section 402 must therefore be construed as imposing upon the court a "judicial obligation with respect to enforcement of the Secretary's certification." Hodgson v. Local 2212 Carpenters Resilient Flooring Union, 457 F.2d

---

19. S.Rep. No. 187 on S. 1555 as reported, 86th Cong., 1st Sess., 21 (1959) as contained in 1 Legislative History 417. This language has been adopted by the Supreme Court, Wirtz v. Local 153, Bottle Blowers Ass'n, 389 U.S. 463, 472–473, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

20. Section 402(d) states:
(d) An order directing an election, dismissing a complaint, *or designating* *elected officers of a labor organization* shall be appealable in the same manner as the final judgment in a civil action, but an order directing an election shall not be stayed pending appeal.
Landrum-Griffin Act § 402(d), 29 U.S.C. § 482(d) (1970) (emphasis added).

1364, 1368 (3rd Cir. 1972). Implicit in this "judicial obligation" is the mandate that the court's decree conform to the legal standards established by the Landrum-Griffin Act and the Taft-Hartley Act. The courts cannot ignore the law. Nor should they sanction an illegal act by giving that act legal status. If a person is rendered ineligible by law to hold union office, the court cannot transcend the boundaries of the law and declare that person a valid union official. Thus, at a minimum, in order for the court properly to conclude that a candidate should be declared a union officer, the court must first determine the eligibility of a candidate as defined by law. Therefore, it is incumbent upon the Secretary of Labor to disclose to the court all factors which might affect both a candidate's status and the court's deliberations.

Accordingly, the motion of the Secretary of Labor is granted.

So ordered.